FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

97 SEP 30  PM 3: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

MITZI L. SWEET, STACY AYCOCK        }
HOLLAWAY, DAPHANIE                  }
FRETWELL, JEAN WILCOXSON            }
WITT,                              }
                                   }
        Plaintiffs,                }
                                   }          CASE NO. CV 96-B-0545-NW
                                   }
v.                                 }
                                   }
COLUMBIA HEALTHCARE                }
CORPORATION, NORTHWEST             }          ENTERED
MEDICAL CORPORATION; and           }
DON SIMPSON,                       }          SEP 3 0 1997
                                   }
        Defendants.                }
                                   }
                                   }

MEMORANDUM OPINION

Currently before the court are the Motions for Summary Judgment filed by defendants

Columbia/HCA Healthcare Corporation ("Columbia"), Northwest Medical Center, Inc.

("Northwest"), and Don Simpson ("Simpson"). Upon review of the record, the submissions of

the parties, the arguments of counsel, and the relevant law, the court is of the opinion that these

motions are due to be granted.

Plaintiffs Mitzi Sweet ("Sweet"), Daphanie Fretwell ("Fretwell"), Stacy Aycock Hollaway

("Hollaway"), and Jean Witt ("Witt") brought this action against Northwest Medical Center,

(their employer or former employer), Columbia/HCA Healthcare Corporation, (an affiliated

entity) and Don Simpson (their former supervisor), alleging sexual harassment and retaliation

under Title VII, as well as claims for assault and battery and intentional infliction of emotional distress ("outrage").

All four plaintiffs were employed as respiratory therapists or aides in the Respiratory Care Department of Northwest Medical Center ("Northwest"). All plaintiffs, with the exception of Witt, were "pool" or as-needed employees during the events made the basis of this suit. Plaintiffs Fretwell, Hollaway and Witt allege that they suffered extensive sexual harassment perpetrated by Simpson, the supervisor of their department. Plaintiff Sweet claims that, although sexual harassment was not directed at her, she witnessed sexual harassment directed toward Hollaway and was thereby exposed to an abusive work environment. Plaintiffs further assert that they were retaliated against in violation of Title VII for reporting the sexual harassment in question. All plaintiffs assert a state law claim of "outrage" against defendants based on the actions of Simpson. Plaintiffs Fretwell and Witt assert a state law assault and battery claim.

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to

2

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. Rule 56 (c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman*. 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### A.    Plaintiffs' Title VII Sexual Harassment Claims

Plaintiffs claim that defendants are liable for Simpson's alleged sexual harassment under theories of quid pro quo sexual harassment and hostile environment sexual harassment. Simpson correctly contends that he cannot be held individually liable under Title VII for any alleged sexual harassment. Northwest contends it is not liable on two grounds. First, Northwest argues no

3

cognizable claim of quid pro quo sexual harassment has been stated by the plaintiffs. Second, Northwest argues that it cannot be held liable for the alleged hostile environment sexual harassment because it took prompt remedial measures once it received notice of the alleged conduct. Columbia contends that it is cannot be held vicariously liable for the actions of Northwest because it is a separate entity from Northwest and not the plaintiffs' employer. Columbia also argues that even if it could be held vicariously liable based on Northwest's conduct, it should not be held liable here because Northwest took prompt remedial action once it learned of the alleged sexual harassment. As will be discussed in greater detail below, the court agrees with the above arguments and is of the opinion that summary judgment is due to be granted as to all of plaintiffs' Title VII claims.

       1.     Don Simpson's Individual Liability Under Title VII

Simpson cannot be held individually liable under Title VII for his alleged sexual harassment. The Eleventh Circuit has reaffirmed its decision in *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) that "[i]ndividual capacity suits under Title VII are . . . inappropriate." *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995). Thus, claims against Simpson under Title VII are due to be dismissed.

       2.     Northwest's Liability Under Title VII

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *Steele v. Offshore Shipbuilding, Inc.,* 867 F. 2d 1311, 1315 (11th Cir. 1989) (citations omitted). The law recognizes two varieties of sexual harassment: quid pro quo sexual harassment and hostile work environment

4

sexual harassment. *Steele,* 867 F.2d at 1315; *Henson v. City of Dundee,* 682 F.2d 897, 908 n.18 & 910 (11th Cir. 1982). Quid pro quo sexual harassment "occurs when an employer alters an employee's job conditions as a result of employee's refusal to submit to sexual demands." *Steele,* 867 F.2d at 1315. Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986); *Steele,* 867 F.2d at 1315.

        a.     Quid Pro Quo Sexual Harassment

Plaintiffs Witt, Fretwell and Hollaway claim to have suffered from quid pro quo sexual harassment.[1]  An employer is strictly liable for quid pro quo sexual harassment because "[w]hen a supervisor **requires sexual favors** as a *quid pro quo* for job benefits, the supervisor by definition, acts as the company." *Steele*, 867 F.2d at 1316 (emphasis added). "In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo*." *Henson,* 682 F. 2d at 910; *Steele,* 867 F.2d at 1316.

A plaintiff need not prove knowledge on the part of the employer. *See Prescott v. Independent Life & Accident Ins. Co., 878 F. Supp. 1545, 1549 (M.D. Ala. 1995). However, the Eleventh Circuit emphasizes that "[t]he acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of

---

[1] Sweet concedes that she is not making a claim of quid pro quo sexual harassment. Sweet bases her Title VII sexual harassment claim entirely upon witnessing Simpson allegedly harassing Hollaway.

a tangible job detriment in order to create liability under this theory of sexual harassment."
*Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982).

No plaintiff has presented any evidence that Simpson demanded sexual favors in exchange for a job benefit or to avoid a job detriment. Witt stated that Simpson never suggested to her any benefit or detriment conditioned on compliance with sexual requests. (Witt dep. at 350-352). Fretwell also testified that Simpson never said "give me sex" or "do a sexual favor for me," but she stated that perhaps if she had allowed the other forms of Simpson's harassment (including pinching her bottom and grabbing her breast) to progress, Simpson would have eventually requested a sexual favor. (Fretwell dep. at 240-42). Fretwell was apparently apprehensive that things might progress to that point, but they did not so progress, and Simpson never requested a sexual favor. Fretwell's speculation that **if** she had let him go further, "he **would have** requested a sexual favor," (Fretwell dep. at 241) (emphasis added) does not amount to an actual occurrence of quid pro quo sexual harassment. Similarly, Hollaway testified that although Simpson never directly requested a sexual favor, he would have at some point **if** Hollaway had indulged Simpson in the sexual conversations which he initiated. (Hollaway dep. at 126-27). This allegation does not amount to quid pro quo sexual harassment.

Fretwell and Hollaway alternatively argue that Simpson was requesting sexual favors indirectly by talking about sex and implicitly requesting that the plaintiffs do him the favor of letting him talk about sex or have conversations about sex. In other words, according to these plaintiffs, it was a sexual favor for Simpson to hear himself talk about sexual things. Perhaps a specific request for gratifying sexual conversation coupled with a specific threat to fire or otherwise discipline plaintiffs would amount to quid pro quo sexual harassment. However, plaintiffs' premise

6

effectively destroys the distinction between quid pro quo and hostile environment sexual harassment. Most forms of hostile environment sexual harassment involve some talk about sex, either in the form of conversations about sex or jokes about sex. The court refuses to adopt plaintiffs' premise.

The gravamen of a quid pro quo claim is that a plaintiff is presented with a choice of acceding to sexual demands to gain or avoid losing some job benefit or promotion, or refusing the sexual demands and suffering the consequences. Here, plaintiffs simply were not presented with any such bargain. Plaintiffs have presented no evidence of sexual blackmail or extortion of "something for something." Rather, plaintiffs concede that Simpson never requested sexual favors; they merely speculate that he **would have** if they had allowed the sexual harassment to progress any further.

Although plaintiffs claim that Simpson threatened them with termination, no **evidence** was presented that threats were made by Simpson to fire or otherwise discipline plaintiffs in any context that might be considered sexual or harassing. Although threats were made, they were made in the context of legitimate employment concerns rather than in sexually harassing situations. Specifically, Simpson threatened to terminate Fretwell only by stating that if pool employees did not fill vacancies and shift needs, Northwest would have to let them go. (Fretwell dep. at 571-574). Witt testified that Simpson threatened to terminate her on two occasions by (1) telling her that she would be fired if she did not come to work when scheduled, and (2) telling her that she would be fired if he discovered that she had broken into his desk. (Witt dep. at 260-261, 273). Although each plaintiff was asked to recount every single sexual harassment incident that they could recall and all statements made during each incident, no plaintiff stated that Simpson

7

threatened to fire them if they did not comply with his sexual requests. (Fretwell dep. at 245-288; Hollaway dep. at 126-203; Witt dep. at 295-324).

While a plaintiff need not produce direct evidence of a link between an adverse employment action and the rejection of sexual advances, she must produce sufficient evidence from which it can be reasonably inferred that she rejected the alleged sexual advances and that her rejection was the "cause of a tangible job detriment." *See Henson*, 682 F.2d at 909. Plaintiffs' quid pro quo sexual harassment claims also fail because plaintiffs have not presented any evidence that could reasonably support an inference that their rejection of sexual advances "affected tangible aspects of [their] compensation, terms, conditions or privileges of employment." (*Id*.)[2]

For the foregoing reasons, the court is of the opinion that the defendants' motions for summary judgment are due to be granted with regard to plaintiffs' quid pro quo sexual harassment claims.

     b.     Hostile Environment Sexual Harassment

Defendants have essentially conceded for purposes of the summary judgment motion that the alleged harassment occurred and that it was sufficient to create a hostile working environment for plaintiffs Hollaway, Fretwell, and Witt.[3] The thrust of Northwest's motion for summary judgment with regard to the sexual harassment claims (both quid pro quo and hostile environment)

---

   [2] In fact, Fretwell received increasingly higher evaluations and wages throughout her tenure with Northwest.

   [3] Northwest does argue that Sweet's claim of sexual harassment fails on the grounds that the five to ten incidents she allegedly witnessed were insufficient to alter her working conditions and create a hostile environment. The court need not address this argument, however.

is its assertion that it is not liable because it undertook prompt remedial measures once it learned of the alleged sexual harassment.

To hold Northwest indirectly, or vicariously, liable, plaintiffs must show that Simpson was acting as Northwest's agent when he committed the alleged harassment. *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535 (11th Cir. 1997). In order to hold Northwest directly[4] liable for the hostile environment created by Simpson, plaintiffs "'must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.'" *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 753 (11th Cir. 1996) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)); *accord Faragher*, 111 F.3d at 1535. In proving direct liability, plaintiffs may show that the employer had actual notice of the harassment because one or more of the plaintiffs complained to higher management, or plaintiffs may show that the employer had constructive notice by demonstrating that the harassment was so pervasive that an inference of constructive knowledge would arise. *See Kilgore*, 93 F.3d at 753-54 (citation omitted).

An employer may be held indirectly liable under agency principles for hostile environment sexual harassment either (1) "when [the] harasser is acting within the scope of his employment in perpetuating the harassment" or (2) "when [the] harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency

---

[4] Courts in previous cases, including *Kilgore*, have referred to liability based on actual or constructive notice as "indirect" liability. In an attempt to "marry[] the common law agency terms to their proper, traditional common law principles" the Eleventh Circuit has decided to refer to this type of liability as "direct" and agency liability as "indirect" or vicarious. *See Faragher*, 111 F.3d at 1535 n. 4.

9

relationship." *Faragher*, 111 F.3d at 1536 (citations omitted). As the court has already determined, this case does not involve quid pro quo sexual harassment, and the Eleventh Circuit has held that "in a pure hostile environment case, a supervisor's harassing conduct is typically outside the scope of his employment." *Faragher*, 111 F.3d at 1535 (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989)).

Accepting plaintiffs' allegations as true for purposes of the summary judgment motions, Simpson was acting outside of the scope of his employment and seeking to further his personal ends when he committed the acts of which plaintiffs complain. *See id.* at 1536-37. Thus, the court is of the opinion that Northwest is not liable under the first part of the test for agency liability. Furthermore, Simpson was not aided in harassing the plaintiffs by the existence of any agency relationship with Northwest. Simpson did not threaten to fire plaintiffs for trying to avoid his harassment, nor did Simpson take or recommend any adverse employment action against plaintiffs on the basis of their response to his harassment. *See id.* at 1537. Therefore, Northwest does not fit within the second prong of the test, and Northwest cannot be held indirectly liable for Simpson's alleged sexual harassment of the plaintiffs.

Consequently, the next question is whether Northwest is directly liable for Simpson's alleged harassment. Plaintiffs' first argument is that Northwest had constructive notice of the alleged harassment prior to Sweet's termination memorandum that arguably gave Northwest actual notice of the alleged harassment. Having considered the evidence presented by the parties, the court is of the opinion that Northwest did not have constructive notice.

The question of constructive notice to the employer is distinct from the question of whether the conduct was pervasive enough to create an abusive work environment. *Faragher*, 111 F.3d

10

at 1538. Plaintiffs have not presented any evidence, on which a reasonable jury could conclude that Northwest knew or should have known of the alleged harassment prior to the memorandum from Sweet following her termination.

According to the plaintiffs' own testimony, virtually all of the alleged sexual harassment occurred in private without any witnesses. Fretwell, who claims perhaps the most egregious sexual harassment, testified that 95 percent of the harassment was done in Simpson's office with no third person present. (Fretwell dep. at 254). She further testified that she was not aware of any sexual harassment directed at other employees until she compared notes with other plaintiffs just prior to coming forward in March 1994. (Fretwell dep. at 215, 226-27, 231). In fact, when she did tell other department employees about her alleged sexual harassment, many expressed shock or were "flabbergasted." (Fretwell dep. at 226-27, 231). With regard to harassment directed at Witt, she was aware of only two witnesses to a single verbal incident occurring in early 1992. (Witt dep. at 341-42). Likewise, Hollaway testified that she was aware of only a few statements made by Simpson to her which were witnessed by co-employees. (Hollaway dep. at 201-02).

The handful of incidents that allegedly did not occur in private were insufficient as a matter of law to put Northwest on notice of the alleged sexual harassment. *See Faragher*, 111 F.3d at 1538-39. The plaintiffs themselves generally did not know any harassment was occurring as to each other until their discussions just prior to coming forward in March 1994. Further, no evidence was presented that any events were witnessed by Northwest's management or that any of the events witnessed by other employees were reported to management prior to Sweet's

complaints in February 1994.[5]  The investigation of the sexual harassment allegations conducted

by Northwest further demonstrated that the sexual harassment was not occurring in a flagrant or

obvious manner.  Most of the department employees reported they had not seen or heard anything

inappropriate by Simpson.  Therefore, the court is of the opinion that the harassment in question

was not so pervasive as to give rise to an inference of constructive knowledge in Northwest.

Northwest first received actual notice of alleged sexual harassment in a limited allegation

made by Sweet after her termination for alleged patient neglect.  On February 4, 1994, Sweet was

terminated for an incident which occurred on January 29, 1994.  In that incident, Sweet was

smoking in an interior stairwell and could not hear her name being called over Northwest's paging

system, and she, therefore, took more than twenty-six minutes to respond to those pages

requesting that an electrocardiogram (EKG) be performed on a patient experiencing chest pains.

In paragraph eleven of her post-termination grievance, Sweet stated: "There have been

many instances of sexual harassment spoken of amongst the employees.  To include a conversation

with an employee about her dislike of sex to the point of asking her why would she want to be

married."  According to Sweet, this was the first report of sexual harassment she made to

Northwest and it was made **after** her termination on February 4, 1994. During the grievance

process, Sweet expanded upon these allegations by relating one incident of Simpson sexually

---

[5]  Witt apparently had a discussion with Vickie King in January 1994 concerning the alleged harassment.  Ms. King was not a member of management at the time of this discussion, however.  Jordan (a non-plaintiff in this action) and Lancaster, a co-employee, also had discussions regarding the alleged harassment, as well.  Lancaster was the more senior employee and would occasionally be left in charge when she was working with Jordan and Simpson had to leave, but she was not a member of management at Northwest.

12

harassing Hollaway "during a day shift in the month of December 1993" and by claiming that Witt had previously switched shifts in an effort to avoid sexual harassment from Simpson.

Debbie Pace, the Director of Human Resources, investigated Sweet's complaints. On March 4, 1994, after Pace had begun her investigation of Sweet's allegations, Fretwell lodged a formal complaint of sexual harassment with Pace regarding Simpson. In response, Pace undertook a full scale departmental investigation.

At the beginning of the investigation, Pace notified the President and CEO of Northwest of the allegations, solicited advice regarding the investigation from other human resource consultants, prepared and scheduled her interviews and placed Simpson on a temporary leave. Pace then conducted confidential interviews with every employee in the Respiratory Care Department as well as a few former employees whose names were mentioned during the investigation. It was at this time that Hollaway and Witt were interviewed by Pace and, for the first time, brought to Northwest's attention their concerns or complaints of sexual harassment.

The investigation yielded somewhat conflicting results. Plaintiffs reported the alleged sexual harassment, but, although Witt voiced concern over Simpson's conduct from years prior, she assured Pace that she was comfortable with Simpson, that she had worked out her problems with Simpson, and that she could talk to Simpson and deal with any problems on her own. The majority of employees in the department reported that they had not seen or heard anything inappropriate by Simpson. Pace and Stewart, Northwest's President and CEO, interviewed Simpson, who admitted some off color joking and teasing but denied most of the allegations.

While conducting the departmental interviews, Northwest received reports which indicated that Sweet, the recently terminated employee, was instigating or coercing employees into making

13

charges against Simpson. Consequently, concern arose that Sweet was the catalyst for these charges and was attempting to get back at Simpson after her termination. Based upon the circumstances surrounding the complaints and the conflicting reports it received, Northwest determined that the investigation was inconclusive.

An employer may avoid direct liability for hostile environment sexual harassment only by taking "immediate and appropriate corrective action" once it knows or should know of the harassment. *See Faragher*, 111 F.3d at 1535. Therefore, the court must address the questions of when Northwest received actual notice of the harassment and whether or not its response was adequate.

No probative evidence was presented that Northwest knew of the alleged sexual harassment prior to the limited allegation made by Sweet in February 1994 contained with her post-termination grievance.[6] According to Sweet, this was the first report of sexual harassment she made to Northwest, and it was made **after** her termination. Sweet eventually expanded on these claims, and Pace investigated all of these complaints. Fretwell lodged her formal complaint of sexual harassment on March 4, 1994, less than 30 days after Sweet was terminated. The evidence reflects that Pace's subsequent full-scale departmental investigation was adequate and appropriate.

---

[6] Plaintiffs claim that Witt's discussion with Vickie King in January 1994 constitutes notice to Northwest. The court disagrees. King was not a member of management or higher management, and Witt talked to King as a friend and asked her to keep the discussion confidential. *See Faragher*, 111 F.3d at 1538 (essentially approving the district court's determination that although several lifeguards had complained to Lieutenant Gordon, he did not rank as higher management in the city for the purposes of imputing knowledge to the city). For similar reasons, the court also rejects plaintiffs' argument that the discussions between Jordan and Lancaster constituted notice to Northwest.

14

Pace consulted with her superiors for advice and guidance, conducted extensive interviews, and placed Simpson on temporary leave.

By the end of the investigation, all of the plaintiffs had informed Northwest of harassment by Simpson, but Witt had assured Pace that she had worked out any problems with Simpson and was comfortable with him. Furthermore, most department employees had never seen or heard of any inappropriate conduct by Simpson, and although Simpson admitted some off color joking and teasing, he denied most of the allegations against him. Finally, Northwest received reports that suggested that Sweet was instigating or coercing employees into making charges against Simpson. As a result, Northwest determined that the investigation was "inconclusive." Nonetheless, Northwest took corrective measures which were effective in ending the alleged harassment,[7] despite plaintiffs apparent dissatisfaction with the level of punishment levied against Simpson.

The "remedial action" required for an employer to avoid liability must be "reasonably likely to prevent the misconduct from reoccurring." *Kilgore*, 93 F.3d at 754 (citation omitted). In the present case, Northwest's actions were not only designed to stop the harassment, but they were effective in doing so. Following the investigation, Northwest reaffirmed its sexual harassment policy and warned Simpson that any further allegations would be investigated and could result in his termination. Further, Pace and Stewart instructed Simpson not to work alone with a female employee at anytime except "in emergencies in which patient's care would be

---

[7] Witt testified that Simpson called her twice after the investigation asking her to come back to the day shift and telling her he missed her. Witt concedes nothing of a sexual nature was said in these telephone calls.

jeopardized". Northwest also instructed Simpson to reevaluate his training practices and to cease all joking and teasing in any form or fashion. Simpson was also required to apologize to the Respiratory Care Department in a departmental staff meeting for any behavior which may have been perceived as inappropriate. After the apology, Pace informed Hollaway, Fretwell and Witt of the outcome of the investigation.[8] Pace directed them to report any further harassment or problems directly to Human Resources and offered them a transfer within Northwest if they were uncomfortable staying in the unit.[9] Furthermore, after the investigation Northwest made frequent walk-throughs to monitor the Respiratory Department and had discussions with employees to ensure that the department was free of sexual harassment. Significantly, plaintiffs Hollaway, Fretwell and Witt testified that after the foregoing actions were taken by Northwest, they were not aware of any further sexual harassment by Simpson.[10] Any imperfection in the investigation (which the court does not find) was rendered irrelevant because Northwest took remedial measures to end the harassment, and the harassment ceased. *See Kilgore*, 93 F.3d at 754; *Waymire v. Harris County, Tex.*, 86 F.3d 424, 428-29 (5th Cir. 1996); *Spicer v. Virginia Dep't of Corrections*, 66 F.3d 705, 710-11 (4th Cir. 1995); *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 795 (5th Cir. 1994). Therefore, because Northwest took prompt remedial action when it learned of

---

[8] Sweet had been terminated at this point.

[9] There is conflicting evidence as to whether Hollaway was actually offered a transfer.

[10] Jordan, another employee in the respiratory department, testified that Simpson made some inappropriate jokes or statements even after the investigation. According to their testimony, plaintiffs Hollaway, Fretwell and Witt were not aware of these remarks. As noted, plaintiff Sweet had been terminated and was no longer at the hospital.

16

the sexual harassment allegations, it is entitled to judgment on plaintiffs' Title VII sexual harassment claims.

**B.      Plaintiffs' Claims of Retaliation**

Plaintiffs also claim that they were subjected to illegal retaliation for complaining of the alleged sexual harassment at issue here. Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). The familiar standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), apply to plaintiffs' claims of retaliation. In order to present a prima facie claim of retaliation, a plaintiff must demonstrate (1) that she engaged in a statutorily protected activity; (2) that the employer took some adverse employment action against her; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989). Further, timing, i.e., the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Boothe v. Birmingham News Co.,* 704 F. Supp. 213, 215-17 (N.D. Ala.), *aff'd*, 864 F.2d 793 (11th Cir. 1988); *cf. Hamm v. Members of Bd. of Regents,* 708 F.2d 647, 652 & 654 (11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her activity even though she was transferred shortly after filing a written complaint with the EEOC).

17

Assuming a plaintiff can satisfy her prima facie case, a burden of production arises for the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Morgan,* 959 F.2d at 1547.  In satisfying this burden:

> The employer's burden of rebuttal is "exceedingly light."  Since the rebuttal burden is one of production only, the employer "need not persuade the court that it was actually motivated by the proffered reasons . . . .  It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1984) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)) (alterations in original) (citation omitted).  Thereafter, the burden shifts to plaintiff to demonstrate with probative evidence that the employer's articulated reasons for the adverse employment action are pretextual. *See Tipton,* 872 F.2d at 1495.

1.   Sweet's Retaliation Claim.

It is undisputed that Sweet first notified Northwest about alleged sexual harassment after she was terminated.  Her claim that she was terminated by Northwest because Northwest knew she was **planning** to come forward with reports of sexual harassment is unfounded.  The evidence shows that Sweet was terminated for patient neglect.  Sweet has presented no evidence that Northwest was aware of any intention on Sweet's part to report sexual harassment prior to her raising the issue after her termination.  Sweet never communicated that intention to anyone in management.  Furthermore, she admitted that she had no evidence or information that anyone in management knew of her intention to report these matters.  Although Sweet claims that she told a handful of co-workers about her intentions and that it was "common knowledge" in the department, Sweet has no evidence that any co-worker told anyone in management at Northwest.

18

Finally, Jean Hester was the nursing supervisor who reported Sweet's misconduct, and Sweet has presented no evidence that Hester was aware of Sweet's intent to come forward.

Northwest is entitled to judgment as a matter of law as to Sweet's retaliation claim on several grounds. First, Sweet has failed to satisfy her prima facie case. She has produced no evidence that she engaged in any statutorily protected activity prior to her termination. Even assuming her discussions with co-workers about her intentions to report could qualify as a statutorily protected activity, she has not produced any evidence that anyone involved in the termination decision was aware of her alleged plan to report sexual harassment. Sweet has failed to show that she engaged in any protected activity or that anyone in Northwest's management, including the decision-makers involved in the decision to terminate her, were aware of her alleged protected activity. Thus, she has failed to establish a prima facie case of retaliation.

In addition, even if Sweet had overcome her prima facie burden, Northwest would still be entitled to summary judgment because Northwest articulated a legitimate non-discriminatory reason for its action, and Sweet has not presented evidence sufficient to show that Northwest's articulated reason is pretextual. In fact, Sweet admitted she was smoking in a stairwell where she could not hear her pages even though she was the only respiratory care employee on the shift at the time. Sweet further admitted that it took her twenty-six minutes to respond to the page for a patient experiencing chest pains. Hester, the nurse who had paged her to perform the EKG, was the same person who complained of her misconduct and reported it to management. Sweet also conceded that Hester had confronted Sweet once before about missing a page. Finally, Sweet's explanations for her delayed response are irrelevant to the question of whether Northwest terminated her because of its good faith belief that she had endangered or neglected a patient. The

question is not whether the decision was "right," but whether it was based upon a legitimate, non-discriminatory reason. Northwest has met its burden of showing that the decision was based on such a reason, and plaintiff has not rebutted this showing.

 2. Witt's Retaliation Claim

Witt alleges that Northwest retaliated against her in violation of Title VII in a couple of different ways. First, Witt claims that Northwest retaliated against her by not hiring her back into her full time position after she voluntarily switched to a pool position in October 1995. Second, she claims that Northwest retaliated against her by failing to give enough referrals to her home oxygen service, Respi-Care, after she voluntarily left Northwest to begin her own business.[11]

As to Witt's first claim, she has failed to establish a prima facie case of retaliation because no evidence links the unavailability of Witt's old position with Witt's report of sexual harassment over a year and a half prior. Witt claims that she requested transfer in September 1995 from her full-time position to a "pool" (as needed) position for various personal reasons. Witt voluntarily shifted to pool status, and the position had been filled by the time she decided to return to it.[12] Further, assuming *arguendo* that plaintiff had established a prima facie case, Northwest has articulated a legitimate non-discriminatory reason for its actions, and Witt has failed to present

---

[11] Witt also claims that leaving Simpson in the department after the sexual harassment investigation was an act of "retaliation" against her. This does not qualify as an adverse employment action under the circumstances, especially in light of the inconclusive investigation and the fact that the harassment ended.

[12] Witt argues that Northwest did not post this position before filling it and, therefore, did not follow its own procedures. Northwest has presented evidence that it did post this position prior to filling it. It is irrelevant whether or not Northwest properly posted the position before filling it because Witt did not seek to return to the position until after it had been filled.

any substantial evidence that Northwest's articulated reason is pretext. Northwest presented evidence demonstrating that Witt transferred to pool status effective September 3 or 4, 1995, and that the vacancy created by her transfer was filled by Danita Burleson on September 22, 1995. Witt concedes that her former position was no longer available when she asked to have it back.[13]

Witt also argues that she was retaliated against because she did not receive many referrals to her home health care business, Respi-Care Service. Defendants presented evidence, however, that referrals to various home health services, when they are made, are made by independent physicians and not by Northwest or its employees.[14] In the case of a patient who needs home health services after his or her stay at Northwest, a list of all providers would be given to the patient, and no specific reference would be made. The parties do not dispute the fact that Northwest's list includes Witt's Respi-Care Service as a service from which to select.

With regard to Witt's second allegation that Northwest retaliated against her by failing to send referrals to her home health oxygen supply company, plaintiff has also failed to present a prima facie case. Plaintiff has presented no competent evidence that the lack of referrals was causally linked to her complaint of sexual harassment. Plaintiff argues that she was told by an

---

[13] Plaintiffs' assertion that Fretwell told Witt that Fretwell heard from some source unknown to Witt that Winburn (a co-employee) told the unknown source that Cantrell said that Simpson told Cantrell "who the troublemakers were," is inadmissible hearsay (to say the least) and is not proper evidence to raise an issue of fact. *See Pritchard v. Southern Co. Serv.,* 92 F.3d 1130, 1135 (11th Cir.), *amended in part,* 102 F.3d 1118 (11th Cir. 1996), *cert. denied,* 117 S. Ct. 2453 (1997); *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir. 1996), *aff'd on other grounds,* 117 S. Ct. 1734 (1997).

[14] Witt testified that she had previously received referrals from two doctors at Northwest but no longer got referrals from them because one doctor moved to China and the other was relieved of privileges at Northwest.

21

unidentified discharge planner that the planner had been told "not to use her company." As an initial point, this statement is inadmissible hearsay. Even assuming this remark was made and that admissible evidence could be presented corroborating this remark, the statement does not indicate why the discharge planner was not to use her company. It cannot be presumed that such a remark is causally related to plaintiff's sexual harassment complaint made years earlier. Furthermore, assuming *arguendo* that plaintiff had satisfied her prima facie case, Northwest has articulated a legitimate non-discriminatory reason for plaintiff's alleged lack of referrals. Defendant has shown that independent physicians, not Northwest's employees, make any referrals to home health services that are made. Furthermore, Witt does not argue that Northwest's list of providers of home health services includes Witt's Respi-Care Service.

Northwest argues that even if physicians (who are not employed by Northwest) continued to refer patients to the home health services with which they had established relationships instead of referring patients to Witt's new service, this is not evidence of retaliation by Northwest against a former respiratory employee who made a complaint of sexual harassment almost two years prior. The court agrees. Northwest's limited role is to provide a list of providers to the patient, and its list includes plaintiff's business. Witt has produced no evidence that Northwest negatively influenced the number of referrals that were made to Witt's business in retaliation for Witt's sexual harassment complaint.

### 3.    Fretwell's Retaliation Claim

Plaintiff Fretwell claims that she suffered retaliation in violation of Title VII because: 1) after her compliant of sexual harassment was investigated, Simpson became "withdrawn" and incapable of effectively making decisions in the department; and 2) work was not available to her

22

after she returned from a leave of absence in January 1996. Assuming that Simpson was withdrawn and indecisive, his mood following sexual harassment allegations and an investigation do not constitute an adverse employment action by Northwest to retaliate against Fretwell. Thus, Fretwell's first claim of retaliation must fail.

Fretwell's second claim is also without merit. Patty Cantrell took over as the new Respiratory Care Director in September of 1995, following Simpson's resignation in August of 1995. Hospital policies had always emphasized staffing the respiratory department with certified technicians. In addition to the general policies, a new staff procedure, adopted in January 1996, required that the respiratory department staff at least have one credentialed therapist at all times and that the therapist/tech in charge of CCU/ICU therapy "must be credentialed." Because of the growing need for certified and licensed technicians and therapists, Northwest tried to hire certified employees when vacancies existed. Fretwell, who is not credentialed and has no certification or license of any kind, was on leave of absence from November 1995 through early January, 1996. When she returned, several certified therapists had been hired. Because new certified technicians had been hired and because Fretwell was the only non-credentialed pool employee (and, therefore, could not work many of the shifts alone due to hospital policy), fewer shifts were available to her.

After Fretwell told Cantrell (the new director of the respiratory department) that she was ready to return from her leave of absence, Cantrell informed her that the day shifts had been filled but offered her a night shift. Fretwell declined this position. Some time later, Fretwell changed her mind and tried to accept the night shift, but those hours had already been filled by another employee by that time. At her deposition, Fretwell stated that she did not have any evidence at

23

all that Ms. Cantrell's actions towards her in early 1996 were in any way related to the fact that she had complained of sexual harassment in March 1994.

Fretwell has produced no evidence that the unavailability of a day shift position in January 1996 was causally related to her complaint of sexual harassment made almost two years prior. Rather, the evidence shows that fewer hours were available to non-certified technicians, such as Fretwell and that Fretwell was still offered a substantial number of hours, which she declined. Although Fretwell testified that her sister told Fretwell that Winburn told Fretwell's sister that Cantrell told Winburn that "Daphanie is a troublemaker and she doesn't want her up here," this statement is inadmissible hearsay that cannot be used to defeat a motion for summary judgment, as plaintiff has presented no admissible evidence to otherwise support this contention. *See Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1135 (11th Cir.), *amended in part*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 117 S. Ct 2453 (1997); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), *aff'd on other grounds*, 117 S. Ct. 1734 (1997).  Moreover, Fretwell testified that her reviews and raises continued to improve even after her reports of sexual harassment. Thus, Fretwell has presented no evidence of retaliation.

### 4.    Hollaway's Retaliation Claim

Hollaway claims Northwest retaliated against her by reducing her hours and ultimately terminating her in February 1995.  Northwest counters that Hollaway was an "as-needed" pool employee who was ultimately separated from the pool because she was unavailable or unwilling to work needed shifts.

As evidence of retaliation, Hollaway points to the facts that she was contacted by someone at Northwest about working the day before or the day of her wedding, that the department no

24

longer called her at her parent's house after she was married, and that she did not receive her separation notice until after the scheduled date of her exit interview because the notice was sent to her old address. Defendant argues that these actions were merely mistakes made by Northwest's administration and are not reflective of any retaliatory motive. No reasonable jury could conclude otherwise. Hollaway also relies upon the testimony of Jordan, a co-employee, that Hollaway's hours were redistributed to her "a few weeks but not months" after the March investigation. Hollaway's reliance upon Jordan's testimony is misplaced. Jordan's hours may have increased in the weeks following the March investigation, but Hollaway testified that her hours were reduced around the time of her marriage, which was in late August 1994. Furthermore, Northwest's time records show that Hollaway worked approximately the same number of hours in the three months prior to March 1994 as she did in the three months after March 1994.

Northwest counters that Hollaway's loss of hours in the Fall of 1994 and subsequent separation in February 1995 were the result of her own unwillingness or unavailability to work. Hollaway was a "pool" employee, and the hours available for pool employees were somewhat reduced after a reduction in force in the Fall of 1994. The evidence presented further indicates that Hollaway did not even work the hours she was offered. As Sweet, a co-plaintiff, testified:

> If you do not work in these pools for periods of time, generally department heads will take you off the work list. The deal is if you are available, you work. They have no obligation to work me a set number of hours. I have no obligation to work a set number of hours. If you do not work a set number of hours within a particular period of time, they will take you from their list.

(Sweet dep. at 96-97).

Months prior to her March complaint of sexual harassment,[15] Hollaway wrote Simpson a letter concerning her loss of more hours than Fretwell, the other non-certified technician in the department. She also complained about having to work certain holidays. Simpson's response to her letter included the following excerpt:

> You have been called a number of times to work shifts that would help make up for cut hours. Only on a few occasions have you agreed to work.
>
> . . . .
>
> Stacy, in the year you have been here, you have taken off for at least two weddings, almost every Friday night during football season, and refused to come in a number of times when called. The last time you were called, a message was left and you didn't call back. All of these times missed would have added to worked time.

(Defs.' Ex. 31). This response from Simpson was written in December 1993. Hollaway's January 1994 review, which was completed just prior to her making her harassment complaint in March, rated her with low scores in the areas of dependability, attitude, cooperation and attendance. (Defs.' Ex. 32). The review included the following comment: "Miss Aycock [Hollaway] has been asked to follow all policies and procedures as they apply to 'pool' employees and make herself more readily available to return calls and not refuse when asked to fill a position." (Defs.' Ex. 32).

Northwest also presented undisputed evidence that Hollaway began working full-time at another medical facility, Bethesda, in October of 1994 making substantially more money. (Hollaway dep. at 564).[16] Based upon her regular schedule at Bethesda, Hollaway admittedly was

---

[15] Hollaway first voiced a complaint of sexual harassment to Northwest during Pace's interview of her during the investigation of Fretwell's complaint.

[16] Hollaway was making $7.00 per hour at Bethesda and $4.41 an hour at Northwest. (Hollaway dep. at 564).

very limited in her availability to fill needed shifts with Northwest. Furthermore, in December 1994, a number of attempts were made by various department employees to contact Hollaway to fill needed shifts. She either declined or did not respond to such requests. In December 1994, Hollaway wrote a letter to Simpson asking for advance notice as to which shifts she would be scheduled to work during the holiday season. Simpson responded by asking Hollaway, in writing, to provide him a list of days she would be available and stated he would "be happy to schedule [her] when pool employees were needed." Hollaway never provided the requested list. Moreover, she continually failed to respond to calls from department employees to cover shifts in December 1994 and again in January 1995.

Hollaway and three other non-utilized pool employees were recommended for separation from the pool as "non-utilized pool employees" on February 5, 1995. Defendants contend that all four employees were separated at that time for the same reason. One of the employees separated at the same time as Hollaway acknowledged that Northwest let her go due to her unavailability to work at that time because she was working full-time elsewhere. (Cantrell Aff. ¶ 9). In the memo recommending the separation of these four pool employees, Simpson noted that the respiratory department had paid over 70 hours in overtime in one month to regular employees to cover shifts where pool employees had been unavailable to do so.

Assuming that Hollaway's hours were reduced and recognizing that she was terminated, Northwest has articulated a legitimate non-discriminatory and non-retaliatory reason for its actions and Hollaway has failed to offer sufficient evidence of pretext. Northwest produced substantial evidence that Hollaway had a history of being unwilling to fill needed shifts that began prior to her complaints of sexual harassment. As noted above, before any sexual harassment complaint,

27

Simpson had responded to Hollaway's complaints about her hours by noting that she had been called a number of times to work and had agreed to work only a few of those times and that she had taken significant time off for weddings and other personal reasons. Hollaway's January 1994 review also rated her poorly in the areas of dependability, attitude, cooperation and attendance, and it requested that she make herself more available.

In addition, Hollaway began a more lucrative position working full-time at another medical facility in October of 1994. Hollaway conceded that her availability at Northwest was very limited because of this new position. In late 1994, Northwest or its employees made attempts to contact Hollaway to fill needed shifts. Although Simpson had agreed to try to schedule her according to the days she would be available, she never provided a list of those days. Rather, she continued to fail to respond to calls to cover shifts.

Hollaway and three other pool employees were separated from Northwest at the same time for the same reason. Hollaway offered no evidence to dispute this fact. In fact, one of these other employees acknowledged that Northwest let her go because she was working elsewhere and was unavailable at Northwest. Northwest was paying overtime because its pool employees were not covering the shifts as they were needed, and Northwest needed pool employees that were available. Therefore, Northwest has presented substantial evidence of legitimate non-discriminatory reasons for its actions, and Hollaway has not presented sufficient evidence of pretext to survive summary judgment on this claim. Thus, Hollaway's retaliation claim must fail.

## C.    Plaintiffs' State Law Claims

As an initial point, plaintiffs Witt and Fretwell brought state law claims of assault and battery against both Simpson and the corporate defendants. Defendants argued that these claims

were barred by the statute of limitations, and plaintiffs conceded in their memorandum in opposition to defendants' motions for summary judgment that defendants are entitled to summary judgment on these claims. Thus, summary judgment is due to be granted as to these claims, and the court need not address them further.

All plaintiffs also contend that defendants are liable for the state law claim of outrage. The court is of the opinion that the defendants are entitled to summary judgment on this claim as well.

Sweet's claim for outrage is barred by the statute of limitations. Plaintiffs filed their complaint on February 28, 1996. Sweet was terminated on February 4, 1994, more than two years prior to the filing of the complaint. In Alabama, the tort of outrage is governed by a two year statute of limitations. Ala. Code § 6-2-38(*l*) (1993); *Wright v. Wright*, 654 So. 2d 542, 549 (Ala. 1995); *Archie v. Enterprise Hosp. & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987). Sweet's claim of outrage based on her termination and events leading up to her termination are barred by the statute of limitations. Furthermore, the court holds as a matter of law that no actions with regard to Sweet taken by any defendant in this action after February 27, 1994, rises to the level of outrage required by Alabama law. *See American Road Serv. Co v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980) (discussed below). Thus, Sweet's outrage claim fails.

Fretwell's claim of outrage is also barred by the applicable two year statute of limitations. Fretwell's claim is based entirely on the alleged instances of sexual harassment by Simpson. This harassment ended by January 1994. Accordingly, her outrage claim is time barred.

Witt testified that her outrage claim was based on alleged sexual harassment by Simpson, which did not occur after January 1994. Witt also bases her claim on the fact that Simpson remained in the department after the March 1994 investigation, that Simpson made two telephone

29

calls to her after March 1994 in which he stated that he missed her and asked her to return to the day shift, that Simpson threatened to fire her if he discovered that she had broken into his desk, and that she switched to the undesirable night shift in May 1992 to avoid Simpson's alleged harassment. Witt's outrage claims based on the alleged sexual harassment and her switch to the night shift in 1992 are barred by the two year statute of limitations. Those events all occurred more than two years before February 28, 1996. The remaining events cited by Witt are apparently not barred by the statute of limitations, but, as a matter of law, they do not qualify as outrageous. *See Kilgore,* 93 F.3d at 755. The Alabama Supreme Court has restricted the claim of outrage to recovery only "in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.* 624 So. 2d 1041, 1044 (Ala. 1993). In fact, in order to qualify as outrageous, the conduct must be "so outrageous in character and so extensive in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* at 1043-44 (citations omitted); *Inmon,* 394 So. 2d at 365. None of the events relied on by plaintiff Witt meet this standard.

Similarly, Hollaway bases her claim of outrageous conduct on the alleged sexual harassment, as well as her loss of shift hours and ultimate separation from the pool. The claims based on sexual harassment are barred by the statute of limitations. Furthermore, even if the court were to assume that Hollaway's loss in hours and separation were the result of illegal retaliation, these acts do not rise to the level of outrageousness required by the law. *See Inmon,* 394 So. 2d at 365.

Finally, the Alabama courts have recognized the tort of outrage in only limited categories of cases. *See Thomas,* 624 So. 2d at 1044. The only category into which plaintiffs' claims might

fall is the "egregious sexual harassment" category. *See id*. Plaintiffs admit, however, that all of the alleged sexual harassment by Simpson last occurred in January 1994. Any claim based on those events is barred by the statute of limitations because plaintiffs did not file their complaint until late February 1996. The non-sexual conduct alleged by plaintiffs to have occurred within the statutory period does not rise to the requisite level to constitute outrage as a matter of law. At best, these allegations fall within the category of "mere insults, indignations, threats, arrogance, petty oppressions, or other trivialities." *See Inmon*, 394 So. 2d at 364-65.

As a final point, assuming for the sake of argument that these outrage claims were not time barred, Northwest cannot be liable for Simpson's alleged sexual harassment because (1) Simpson was not acting within the line and scope of his employment; (2) Simpson was not acting in furtherance of Northwest's business; and (3) Northwest did not authorize or ratify the alleged outrageous conduct. *See Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992). Instead, the evidence shows that once Northwest became aware of the alleged harassment, it undertook prompt corrective actions that effectively prevented any further harassment from occurring. Because no other actions by Northwest or Simpson could possibly meet the requirements of a claim of outrage, Northwest is due summary judgment on this alternative ground, as well.

**D.    Columbia's Alleged Parent Liability**

Columbia asserts that it is not liable to plaintiffs under Title VII because it was not plaintiffs' employer and was not responsible for the actions of Don Simpson or any other acts that occurred at Northwest. Plaintiffs argue that Columbia is liable for acts occurring at Northwest to the same extent that Northwest is liable because it is the parent corporation of Northwest. Because the court has determined that Northwest and Don Simpson are entitled to summary

31

judgment as to all claims asserted against them, the question of Columbia's parent liability is essentially moot. However, the court will address this argument because it is a valid alternative theory for summary judgment for Columbia.

The doctrine of limited corporate liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees, and courts have found otherwise only in extraordinary circumstances. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir. 1993) (citing *Johnson v. Flowers Indus., Inc.,* 814 F. 2d 978, 980-81 (4th Cir. 1987)). *See also Watson v. Gulf and Western Indus.,* 650 F.2d 990, 993 (9th Cir. 1981) (holding that "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary"). In the employment discrimination context, the majority of courts apply the "integrated enterprise" test to determine the liability of a parent corporation. *See Richard v. Bell Atlantic Corp.,* 946 F. Supp. 54, 62 (D.D.C. 1996). Therefore, the court will adopt this test, as well. The integrated enterprise test encompasses four factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *See Frank,* 3 F.3d at 1362. Although no single factor is determinative, centralized control of labor relations is an important, if not the critical, factor in determining parent liability. *See id.* at 1363 (citing *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir. 1983)); *Richard,* 946 F. Supp. at 62 (stating that the critical question on summary judgment is whether a genuine issue exists that the parent controls the day-to-day employment decisions of the subsidiaries that employ or employed the plaintiffs) (citations omitted).

Plaintiffs' theory appears to be that Columbia should be liable as the parent corporation of Northwest because it provided products used by Northwest, provided services to Northwest for

a fee, and employed persons working at Northwest, effectively making it the decision maker responsible for any actions taken against employees. Plaintiffs, however, have failed to introduce any competent evidence in support of any of these theories.[17]

Plaintiffs conducted exhaustive discovery which yielded evidence that Northwest Medical Center uses documents prepared by Columbia/HCA Healthcare Corporation, uses policy manuals created on behalf of Columbia/HCA Healthcare Corporation, and offers its employees the opportunity to participate in a health benefits and retirement plan sponsored by Columbia/HCA Healthcare Corporation. These factors bear little or no weight on the issue of whether Columbia can be held liable as the parent of Northwest Medical Center, Inc. As one court stated:

> It is important to note that several factors are of low or no probative value to this inquiry: (1) that the operations of the subsidiaries, themselves, are interrelated; (2) that the parent ultimately benefits from the work of the subsidiary; (3) that the supervisors of the subsidiary ultimately reported to officers in the parent company, or that certain high level management employees perform functions for both companies; (4) that the parent has promulgated broad general policy statements regarding employment matters, including statements governing equal employment opportunity issues, particularly where the subsidiary has discretion concerning whether to use them; (5) that the parent and subsidiary have common advertising guidelines; (6) that the plaintiffs believed that they were employees of the parent; and (7) that the plaintiffs belonged to the parent's pension plan, or that the parent served as the plan administrator for the subsidiary's severance pay plan.

*Richard,* 946 F. Supp. at 62-63 (citations omitted).

Columbia offered the deposition testimony of Robert M. Johnson, Vice President - Columbia/HCA Healthcare Corporation, who testified that: (1) Columbia did not hire, fire or transfer employees of Northwest; (2) Columbia did not have authority to authorize lay-offs, recalls

---

[17] Plaintiffs offered many exhibits, but none of them were supported by deposition or affidavit testimony. In fact, plaintiffs offered no evidence, other than speculative statements, to explain the documents and how they were used by Northwest.

or promotions of Northwest's employees; (3) all day-to-day employment decisions, such as firing and promotion decisions, were made by employees of Northwest); and that Northwest did not receive directives from Columbia with regard to any personnel decisions.

Plaintiffs acknowledge that termination decisions were made by employees of Northwest. Thus, applying the integrated enterprise test, the court is of the opinion that Columbia was not making employment decisions at Northwest and was not the plaintiffs' employer. Consequently, Columbia's motion for summary judgment is due to be granted on this alternative theory as to all of plaintiffs' Title VII and state law claims.

## CONCLUSION

Based on the foregoing, the court is of the opinion that the motions for summary judgment filed by Columbia, Northwest and Don Simpson are due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 30th day of September, 1997.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

34