UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

FILE

00 SEP 29 PM 4:

U.S. DISTRICT COU
N.D. OF ALABAMA

| | | |
|---|---|---|
| MITZI L. SWEET, STACY AYCOCK HOLLAWAY, DAPHANIE FRETWELL, JEAN WILCOXSON WITT, | } } } } } | |
| **Plaintiffs,** | } } } | |
| v. | } } | CASE NO. CV 96-B-0545-NW |
| NORTHWEST MEDICAL CENTER, INC.; COLUMBIA/HCA HEALTHCARE CORPORATION; DON SIMPSON, | } } } } } } | |
| **Defendants.** | } } | |

**ENTERED**

OCT - 2 2000

## MEMORANDUM OPINION

On September 30, 1997, the court entered an Order granting summary judgment for

defendants on all claims brought by plaintiffs. Plaintiffs perfected an appeal to the Eleventh

Circuit Court of Appeals. On January 28, 1999, the Eleventh Circuit entered a Judgment

vacating this court's Judgment in favor of defendants. The case was remanded for the district

court to reconsider the case in light of *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998),

and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). As noted in a Memorandum Opinion

and Order entered September 21, 1999, the court reviewed all claims asserted by plaintiffs and

concluded that the law discussed in *Burlington Industries* and *Faragher* only applies to

plaintiffs' claims of sexual harassment under Title VII against defendant Northwest Medical

Center, Inc. ("defendant" or "Northwest"). In the September 21, 1999, Memorandum Opinion

and Order, the court stated:

> As noted in the court's Memorandum Opinion entered on
> September 30, 1997, defendant Don Simpson cannot be held

116

individually liable under Title VII for his alleged sexual harassment. The *Burlington Industries* and *Faragher* decisions have no effect on the court's decision with regard to this claim. The *Burlington Industries* and *Faragher* decisions also have no application to plaintiffs Witt and Fretwell's state law claims of assault and battery against Simpson and the corporate defendants. *Burlington Industries* and *Faragher* also have no application to plaintiffs' claims against defendant Northwest for retaliation under Title VII. Finally, *Burlington Industries* and *Faragher* do not affect the court's decision that defendant Columbia/HCA Healthcare Corporation is not liable to plaintiffs under Title VII because it was not plaintiffs' employer and was not responsible for the actions of Don Simpson.

The court carefully considered all arguments raised by the parties when it initially granted summary judgment in favor of the defendants on these claims. *Burlington Industries* and *Faragher* have no application to the above-referenced claims. Therefore, having reconsidered the case in light of the Supreme Court's decisions in *Burlington Industries* and *Faragher*, the court is of the opinion that for the reasons stated in the court's Memorandum Opinion entered on September 30, 1997, defendants are entitled to judgment as a matter of law on the following claims:

1.  Any claims against defendant Don Simpson in his individual capacity under Title VII.

2.  All claims against defendant Northwest Medical Center, Inc. for retaliation under Title VII.

3.  All claims against defendant Columbia/HCA Healthcare Corporation.

4.  All state law claims against defendant Simpson and the corporate defendants.

Based on the rationale in the court's September 30, 1997, Memorandum Opinion, the court again entered Judgment in favor of defendants and against plaintiffs on the following claims:

1.  Any claims against defendant Don Simpson in his individual capacity under Title VII.

2. All claims against defendant Northwest Medical Center, Inc. for retaliation under Title VII.

3. All claims against defendant Columbia/HCA Healthcare Corporation.

4. All state law claims against defendant Simpson and the corporate defendants.

(*See* Mem. Op. and Order entered September 21, 1999.)

On October 18, 1999, Northwest filed a Renewed Motion for Summary Judgment as to Plaintiffs' Claims of Sexual Harassment.  The court entered an Order directing the parties to file supplemental memoranda addressing plaintiffs' sexual harassment claims.  Pursuant to the court's directions, the parties submitted additional memoranda addressing the applicability of *Burlington Industries* and *Faragher* to plaintiffs' Title VII claims of sexual harassment against Northwest.  Upon consideration of the memoranda and evidence submitted in support of and in opposition to Northwest's Renewed Motion for Summary Judgment, the *Burlington Industries* and *Faragher* decisions, and the argument of counsel, the court is of the opinion that defendant Northwest Medical Center, Inc. is entitled to judgment as a matter of law on plaintiffs' claims of sexual harassment.

## I. FACTUAL BACKGROUND

Plaintiffs Mitzi Sweet ("Sweet"), Daphanie Fretwell ("Fretwell"), Stacy Aycock Hollaway ("Hollaway"), and Jean Witt ("Witt") brought this action against Northwest Medical Center, Columbia/HCA Healthcare Corporation, (an affiliated entity) and Don Simpson (their former supervisor), alleging sexual harassment and retaliation under Title VII, as well as claims for assault and battery and intentional infliction of emotional distress or outrage.

All four plaintiffs were employed as respiratory therapists or aides in the Respiratory Care Department of Northwest Medical Center.  Fretwell, Hollaway and Witt allege that they

3

suffered extensive sexual harassment perpetrated by Simpson, the supervisor of their department. Sweet claims that, although sexual harassment was not directed at her, she witnessed sexual harassment directed toward Hollaway and was thereby exposed to an abusive work environment.

Defendant essentially conceded for purposes of the summary judgment motion that the alleged harassment occurred and that it was sufficient to create a hostile working environment for Hollaway, Fretwell, and Witt.[1]

## II. DISCUSSION

A.    **Affirmative Defense**

Defendant argues it is entitled to summary judgment because it has established the affirmative defense as articulated in *Burlington Industries* and *Faragher*. In these cases, the Supreme Court defined the standard for determining whether a Title VII defendant may be held liable for the harassing conduct of a "supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807-10; *Burlington Indus.,* 524 U.S. at 754-66. First, if the harassment culminated in some "tangible employment action" against the plaintiff by the alleged harasser, then the company is liable for that harassment. Second, absent "tangible employment action," the employer can avoid liability by presenting evidence satisfying the two prongs of the affirmative defense.

---

[1] Northwest argues that Sweet's claim of sexual harassment fails on the ground that the five to ten incidents she allegedly witnessed were insufficient to alter her working conditions and create a hostile environment. The court need not address this argument, however. The parties addressed sexual harassment as it pertained to Sweet in defendants' initial Motions for Summary Judgment. However, as noted in Northwest's Reply Brief addressed to the Renewed Motion for Summary Judgment before the court, plaintiffs' Amended Complaint does not include a claim of sexual harassment on behalf of Sweet. (*See* Amended Complaint at ¶ 9).

"Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." *Burlington Indus.*, 524 U.S. at 762. The Supreme Court noted that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. It also stated that such an action "in most cases inflicts direct economic harm." *Id.* at 762. In this case plaintiffs suffered no tangible employment action as a result of Simpson's conduct. As the court concluded in its September 30, 1997, Opinion, "plaintiffs have not presented any evidence that could reasonably support an inference that their rejection of sexual advances affected tangible aspects of [their] compensation, terms, conditions or privileges of employment." (Sept. 30, 1997, Mem. Op. at 8.)

In their brief in opposition to defendant's Renewed Motion for Summary Judgment, Hollaway and Sweet argue that acts they previously characterized as retaliation for having engaged in protected activity under Title VII, i.e. Hollaway's reduction in hours and her eventual termination, and Sweet's termination, are tangible employment actions which somehow arose from the harassment, rather than from plaintiffs' reports of the same. In order to strip an employer of the affirmative defense, a plaintiff must establish a tangible employment action which culminated *from the harassment. See, e.g., (Hetreed v. Allstate Ins. Co.*, No. 96 C 2021, 1999 WL 311728, at *5 (N.D. Ill. May 12, 1999) ("Hetreed did not suffer any sort of negative repercussions from Allstate or McGann as a result of the harassment; . . . and her ultimate termination was unrelated to the harassment itself."); *Kibby v. Chief Auto Parts, Inc.*, No. CIV.A.3:97-CV-2180-D, 1999 WL 135261, at *3 (N.D. Tex. March 4, 1999) ("If Kibby alleges

5

that she was terminated from her position with Chief for not submitting to Owens' sexual demands, she must establish 'that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.'").

In this lawsuit, plaintiffs have consistently argued that the alleged tangible adverse actions at issue arose from their reports (or impending reports) of Simpson's behavior, not from the harassment itself. In other words, they have contended throughout this lawsuit that defendants took adverse action against them because they complained of sexual harassment by defendant Simpson. In its September 30, 1997, Memorandum Opinion, the court reviewed the employment actions that plaintiffs argued were taken in retaliation for protected activity under Title VII and determined that the actions were taken for legitimate non-discriminatory reasons.[2]

Plaintiffs argue that Simpson's unfulfilled threats to fire plaintiffs constitute adverse tangible employment action. However, according to the Supreme Court, unfulfilled threats are insufficient as a matter of law to constitute tangible employment action. *See Burlington Industries*, 524 U.S. at 761.

Witt argues that she suffered a tangible employment action when she "fled the more desirable day shift assignment" in order to escape Simpson's sexual harassment. (Pls.' Response to the Renewed Motion for Summary Judgment at 18-19.) The evidence cited by Witt in support of this assertion does not reflect that Witt changed shifts in order to avoid contact with Simpson. To the contrary, as noted in the court's September 30, 1997, Memorandum Opinion at page 20,

---

[2] The court found that Northwest terminated Sweet because of its good faith belief that she had endangered or neglected a patient. (*See* Sept. 30, 1997, Mem. Op. at 18-20.) With respect to Hollaway's claim, the court determined that "[a]ssuming that Hollaway's hours were reduced and recognizing that she was terminated, Northwest has articulated a legitimate, non-discriminatory and non-retaliatory reason for its actions and Hollaway has failed to offer sufficient evidence of pretext." (Sept. 30, 1997, Mem. Op. at 27.)

6

Witt testified that in September 1995, she requested a transfer from her full-time position to a "pool" (as needed) position for various personal reasons. There is no evidence before the court on which a reasonable jury could find that Witt suffered an adverse tangible employment action as a result of Simpson's alleged sexual harassment. *See Burlington Indus.*, 524 U.S. at 761 (reassignment to a more inconvenient job insufficient to constitute a tangible employment action); *Harslon v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to a more inconvenient job inadequate to constitute a tangible employment action.)

Because none of the plaintiffs suffered adverse tangible employment actions, defendant is entitled to the affirmative defense as set forth in *Burlington Industries* and *Faragher*. Where intangible employment action by the supervisor is involved, an employer may assert an affirmative defense to preclude liability. To succeed on this defense, the employer must show, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1367 (11th Cir. 1999) (citations omitted).

## 1.  *Reasonable Care to Prevent and Correct Promptly Sexually Harassing Behavior*

### (a)  *Reasonable Care to Prevent Sexual Harassment*

"A court's assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in preventing sexual harassing behavior." *Coates*, 164 F.3d at 1369. When an employer promulgates a workable anti-harassment policy, it normally meets its burden under the first element of the affirmative

7

defense. *See Faragher*, 524 U.S. at 807-08 (formal sexual harassment policy with sensible complaint procedure satisfies employer's duty of care); *Shaw v. Autozone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) ("While not required as a matter of law, . . . the existence of an appropriate anti-harassment policy will often satisfy this first prong . . . because Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.") (internal citations and quotation marks omitted). In addition, the employer must show that "those employees authorized by the policy to act in response to the complaints did so act when put on notice of a problem and that the actions constituted a reasonable response under the circumstances." *Coates*, 164 F.3d at 1369 n. 5 (J. Barkett concurring).

The evidence before the court reflects that defendant had a well-defined policy against sexual harassment (with an adequate complaint procedure) throughout plaintiffs' employment. The original policy (DX, Ex. B),[3] adopted in 1987, was distributed to employees in their handbooks during each employee's initial orientation period. (DX K at 19-20.) The 1987 sexual harassment policy remained in effect until it was revised and superseded by a new policy in 1993. (DX C.) Fretwell, Witt, Hollaway, and Sweet signed documents acknowledging receipt of handbooks which contained defendant's sexual harassment policy. (DX D and E; DX J at 120-23; DX I 100-107; DX G 139-159; DX H 155-156, 163-170.) All plaintiffs received handbooks which contained the revised sexual harassment policy. *See id.*[4]

_____

[3] Defendant's Evidentiary Submissions in Support of its Renewed Motion for Summary Judgment as to Plaintiff's Claims of Sexual Harassment were filed on October 18, 1999. The court will refer to these exhibits as DX followed by the exhibit letter.

[4] The 1993 acknowledgment form provided in part:
> I acknowledge receipt of the Columbia Employee Handbook. I have read the statement above and will read the policies in this book within a week, ask my supervisor about points I do not understand, and do

8

Both the 1987 and the 1993 policies specifically define sexual harassment and state that the defendant does not tolerate such conduct. Both policies state that a violation would result in disciplinary measures, up to and including termination. In addition to prohibiting sexual harassment, both the 1987 and the 1993 handbooks set forth a grievance procedure whereby employees could bring complaints to the attention of management and/or Human Resources. By providing alternative channels for reporting complaints, an employee was not forced to go through his/her supervisor to register a complaint or grievance. While the 1987 policy directed employees to use a general complaint procedure for all grievances (which nevertheless allowed employees to bypass their supervisors), the 1993 policy included a specific reporting procedure for complaints of sexual harassment. (*Compare* DX B § 5-2 *with* DX C § 8-36.)

The 1993 policy, which was in effect throughout the actionable time at issue stated:

> Sexual harassment in the form of unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature, will not be tolerated. Such behavior will be grounds for disciplinary action, up to and including termination when submission is a condition of employment opportunities, or such conduct interferes with work performance or creates an unpleasant work environment. Complaints are to be made promptly to the facility Human Resources Director, or the employee's manager.

(DX C § 8-36.) In addition, both the 1987 handbook and the revised 1993 handbook encouraged employees to come forward with complaints and made clear that employees would not be subjected to retaliation for doing so. (DX C § 5-19; DX B § 5-2.)

Defendant's sexual harassment policy not only specifically addressed the issue of "sexual harassment" (as opposed to a general EEO policy) but also afforded complainants a choice of

---

hereby agree to accept and abide by these policies. (*See e.g.* DX E.)

two alternate individuals to whom they could register their complaints, *i.e.*, either their manager or Debbie Pace ("Pace"), the Director of Human Resources. Both individuals were then empowered to conduct an investigation into the alleged conduct and take appropriate disciplinary measures.

The evidence reflects that defendant had in place a workable policy against sexual harassment throughout the period of plaintiffs' employment. Thus, defendant has established that it exercised reasonable care to prevent any sexually harassing behavior. *See Coates* 164 F.3d at 1369-70 (finding that the first element of the *Faragher* defense was met because employer "had in place an officially promulgated, user-friendly, sexual harassment policy"); *Shaw*, 180 F.3d at 811-12 (affirming summary judgment for employer on *Faragher* affirmative defense where "anti-harassment policy made clear [the employer's] stand that harassment will not be tolerated, and provided for multiple mechanisms for the proper resolution of complaints"); *Maddin v. GTE of Florida, Inc.*, 33 F. Supp. 2d 1027, 1032-33 (M.D. Fla. 1999) (granting summary judgment for employer on *Faragher* affirmative defense where "[employer's] sexual harassment policy made it clear that sexual harassment would not be tolerated and provided a number of avenues through which sexual harassment could be reported").

  *(b)*  *Reasonable Care to Correct Promptly Any Sexually Harassing Behavior*

In its September 30, 1997, Memorandum Opinion, the court determined as a matter of law that defendant took immediate and appropriate corrective action once it knew of the harassment:

> At the beginning of the investigation, Pace notified the President and CEO of Northwest of the allegations, solicited advice regarding the investigation from other human resource

consultants, prepared and scheduled her interviews and placed
Simpson on a temporary leave.  Pace then conducted confidential
interviews with every employee in the Respiratory Care
Department as well as a few former employees whose names were
mentioned during the investigation.  It was at this time that
Hollaway and Witt were interviewed by Place and, for the first
time, brought to Northwest's attention their concerns or complaints
of sexual harassment.

The investigation yielded somewhat conflicting results.
Plaintiffs reported the alleged sexual harassment, but, although
Witt voiced concern over Simpson's conduct from years prior, she
assured Pace that she was comfortable with Simpson, that she had
worked out her problems with Simpson, and that she could talk to
Simpson and deal with any problems on her own.  The majority of
employees in the department reported that they had not seen or
heard anything inappropriate by Simpson.  Pace and Stewart,
Northwest's President and CEO, interviewed Simpson, who
admitted some off color joking and teasing but denied most of the
allegations.

While conducting the departmental interviews, Northwest
received reports which indicated that Sweet, the recently
terminated employee, was instigating or coercing employees into
making charges against Simpson.  Consequently, concern arose
that Sweet was the catalyst for these charges and was attempting to
get back at Simpson after her termination.  Based upon the
circumstances surrounding the complaints and the conflicting
reports it received, Northwest determined that the investigation
was inconclusive.

. . .

No probative evidence was presented that Northwest knew
of the alleged sexual harassment prior to the limited allegation
made by Sweet in February 1994 contained with her post-
termination grievance.  According to Sweet, this was the first
report of sexual harassment she made to Northwest, and it was
made **after** her termination.  Sweet eventually expanded on these
claims, and Pace investigated all of these complaints.  Fretwell
lodged her formal complaint of sexual harassment on March 4,
1994, less than 30 days after Sweet was terminated.  The evidence
reflects that Pace's subsequent full-scale departmental
investigation was adequate and appropriate.  Pace consulted with

11

her superiors for advice and guidance, conducted extensive interviews, and placed Simpson on temporary leave.

By the end of the investigation, all of the plaintiffs had informed Northwest of harassment by Simpson, but Witt had assured Pace that she had worked out any problems with Simpson and was comfortable with him. Furthermore, most department employees had never seen or heard of any inappropriate conduct by Simpson, and although Simpson admitted some off color joking and teasing, he denied most of the allegations against him. Finally, Northwest received reports that suggested that Sweet was instigating or coercing employees into making charges against Simpson. As a result, Northwest determined that the investigation was "inconclusive." Nonetheless, Northwest took corrective measures which were effective in ending the alleged harassment, despite plaintiffs apparent dissatisfaction with the level of punishment levied against Simpson.

The "remedial action" required for an employer to avoid liability must be "reasonably likely to prevent the misconduct from reoccurring." *Kilgore*, 93 F.3d at 754 (citation omitted). In the present case, Northwest's actions were not only designed to stop the harassment, but they were effective in doing so. Following the investigation, Northwest reaffirmed its sexual harassment policy and warned Simpson that any further allegations would be investigated and could result in his termination. Further, Pace and Stewart instructed Simpson not to work alone with a female employee at anytime except "in emergencies in which patient's care would be jeopardized." Northwest also instructed Simpson to reevaluate his training practices and to cease all joking and teasing in any form or fashion. Simpson was also required to apologize to the Respiratory Care Department in a departmental staff meeting for any behavior which may have been perceived as inappropriate. After the apology, Pace informed Hollaway, Fretwell and Witt of the outcome of the investigation. Pace directed them to report any further harassment or problems directly to Human Resources and offered them a transfer within Northwest if they were uncomfortable staying in the unit. Furthermore, after the investigation Northwest made frequent walk-throughs to monitor the Respiratory Department and had discussions with employees to ensure that the department was free of sexual harassment. Significantly, plaintiffs Hollaway, Fretwell and Witt testified that after the foregoing actions were taken by Northwest, they were not aware of any further sexual harassment by Simpson. Any imperfection in the investigation (which the court does not find)

12

> was rendered irrelevant because Northwest took remedial
> measures to end the harassment, and the harassment ceased.

(September 30, 1997, Mem. Op. at 13-16.)(footnotes omitted.)

The court has reviewed all of the evidence on this issue and again concludes, for the

reasons noted in its September 30, 1997, Opinion, that once defendant knew of alleged sexual

harassment, it acted promptly to correct the harassment. Thus, defendant's actions were

sufficient to satisfy Northwest's duty to promptly and adequately respond to plaintiffs'

harassment complaints, as required under the first prong of the affirmative defense. *See, e.g.,*

*Montero v. AGCO Corporation*, 192 F.3d 856, 862-64 (9th Cir. 1999) (employer's response

within eleven days of plaintiff's complaint was prompt and reasonable as a matter of law).

### 2.   *Unreasonable Failure to Complain*

The second step in this analysis is to determine whether the employee "made reasonably

sufficient use of available avenues to put the employer on notice of the problem." *Coates,* 164

F.3d at 1369. The Supreme Court has stated that a plaintiff's failure to use the employer's

complaint procedure for reporting harassment will ordinarily satisfy the second component of

the affirmative defense:

> And while proof that an employee failed to fulfill the
> corresponding obligation of reasonable care to avoid harm is not
> limited to showing any unreasonable failure to use any complaint
> procedure provided by the employer, a demonstration of such
> failure will normally suffice to satisfy the employer's burden under
> the second element of the defense.

*Burlington*, 524 U.S. at 765.

Witt, Hollaway and Sweet never utilized defendant's complaint procedure to report

Simpson's alleged harassment. With respect to Fretwell, while she ultimately followed the

13

complaint procedure and reported harassment to Pace,[5] she unreasonably waited over a year

before doing so.[6]

The first notice to defendant that plaintiffs had complaints of sexual harassment occurred

after Sweet was terminated.  As the court found in its September 30, 1997, Opinion:

> Northwest first received actual notice of alleged sexual
> harassment in a limited allegation made by Sweet after her
> termination for alleged patient neglect.  On February 4, 1994,
> Sweet was terminated for an incident which occurred on January
> 29, 1994.  In that incident, Sweet was smoking in an interior
> stairwell and could not hear her name being called over
> Northwest's paging system, and she, therefore, took more than
> twenty-six minutes to respond to those pages requesting that an
> electrocardiogram (EKG) be performed on a patient experiencing
> chest pains.

> In paragraph eleven of her post-termination grievance,
> Sweet stated: "There have been many instances of sexual
> harassment spoken of amongst the employees.  To include a
> conversation with an employee about her dislike of sex to the point
> of asking her why would she want to be married."  *According to
> Sweet, this was the first report of sexual harassment she made to
> Northwest and it was made after her termination on February 4,
> 1994. . . .*

> Debbie Pace, the Director of Human Resources,
> investigated Sweet's complaints.  *On March 4, 1994, after Pace
> had begun her investigation of Sweet's allegations, Fretwell
> lodged a formal complaint of sexual harassment with Pace
> regarding Simpson.*  In response, Pace undertook a full scale
> departmental investigation.

> At the beginning of the investigation, Pace notified the
> President and CEO of Northwest of the allegations, solicited
> advice regarding the investigation from other human resource

---

[5] As previously noted, Pace was the Director of Human Resources.

[6] According to Fretwell's testimony, Simpson's harassment started as early as three months after she became employed by defendant in *July 1992.*  (DX G 248-249) Yet, Fretwell waited until *February 1994*, to complain to defendant concerning Simpson.

consultants, prepared and scheduled her interviews and placed
Simpson on a temporary leave. Pace then conducted confidential
interviews with every employee in the Respiratory Care
Department as well as a few former employees whose names were
mentioned during the investigation. ***It was at this time that
Hollaway and Witt were interviewed by Pace and, for the first
time, brought to Northwest's attention their concerns or
complaints of sexual harassment.***

(September 30, 1997, Mem. Op. at 12-13.)

Plaintiffs had an obligation to use defendant's established reporting procedures and they

knowingly failed to do so. *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027,

1038 (7th Cir. 1998) ("[T]he law against sexual harassment is not self-enforcing, and an

employer cannot be expected to correct harassment unless the employee makes a concerted

effort to inform the employer that a problem exists.") (citations and internal quotations omitted).[7]

Plaintiffs offered no evidence justifying their failure to complain. The first time they

complained, defendant took immediate action. Plaintiffs' contention that they did not utilize the

procedures because they feared reporting their supervisor is unavailing. There is no evidence

before the court of other employees who were subjected to retaliation because they availed

themselves of defendant's complaint procedure. Plaintiffs' unfounded "fear" is an insufficient

---

[7] Properly applied, the new affirmative defense should effectuate the purposes of Title VII
by encouraging victims to report harassment before it becomes severe or pervasive enough to create
a hostile environment. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir.
1999)("First, when a plaintiff promptly complains about a supervisor's inappropriate sexual actions,
she can thwart the creation of a hostile work environment. To the extent redress is sought, is
justified, and is adequately provided by the company, the complained-of incidents will not likely
have become severe or pervasive enough to create an actionable Title VII claim. This result
effectuates the purpose of Title VII, which cannot guarantee civility in the American workplace but,
at its best, inspires prophylactic measures to deter unwanted sexual harassment. By promptly
invoking a company's grievance procedure, a plaintiff has received the benefit Title VII was meant
to confer. In such cases, an actionable hostile environment claim will rarely if ever have matured.").

excuse as a matter of law. *See, e.g., Shaw*, 180 F.3d at 813 ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Burlington Industries* to alert the employer to the allegedly hostile environment."); *Fierro v. Saks Fifth Avenue*, 13 F. Supp. 2d 481, 492 (S.D.N.Y. 1998) ("A generalized fear [of repercussions and an unpleasant outcome] can never constitute reasonable grounds for an employee's failure to complain to his or her employer."); *Jones v. USA Petroleum*, 20 F. Supp. 2d 1379, 1386 (S.D. Ga. 1998) (conclusory allegations of a fear of repercussions for complaining are insufficient to show that employee was reasonable in not complaining). Plaintiffs offer no other justification for their failure to utilize defendant's reporting procedures.

### III. CONCLUSION

Defendant has met both prongs of the affirmative defense as set out in *Faragher* and *Burlington Industries*. Accordingly, Northwest is entitled to judgment as a matter of law. An Order granting Northwest's Renewed Motion for Summary Judgment as to Plaintiffs' Claims of Sexual Harassment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _29th_ day of September, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge

16